No. 22-15279

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**Gladys Perez,**

Petitioner-Appellant,

**v.**

**Gabriela Najera, et al.,**

Respondents-Appellees.

On Appeal from the United States District Court
for the District of Nevada (Las Vegas)
District Court Case No. 2:14-cv-02087-APG-BNW,
Honorable Andrew P. Gordon, United States District Judge

**Petitioner-Appellant's Opening Brief**

Rene L. Valladares
Federal Public Defender,
District of Nevada
* Amelia L. Bizzaro
Assistant Federal Public Defender
411 E. Bonneville Ave., Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577
Amelia_Bizzaro@fd.org

*Counsel for Gladys Perez

TABLE OF CONTENTS

Jurisdictional Statement ................................................................. 1

Statement of the Issues ................................................................. 1

Statement of the Case ................................................................... 2

    A.    Anthony Colon kills C.F. ............................................ 2

    B.    Gladys is forced into a joint trial with her abuser, who is facing death. ....................................................... 5

    C.    Gladys litigates a habeas petition in federal court. ...... 8

    D.    The lower rejected Gladys's tolling arguments based on interference from prison officials but granted her discovery to develop evidence that Whipple abandoned her. ............................................................. 9

    E.    The lower court grants Najera's motion to dismiss ..... 11

Summary of the Argument ......................................................... 12

Argument ................................................................................... 14

    I.    Gladys's petition is not barred by the AEDPA's statute of limitations. ............................................................. 14

    A.    This Court reviews this case *de novo*. .......................... 14

    B.    The parties agree that Gladys filed her federal petition one week late. ................................................ 15

    C.    The tests for tolling. .................................................... 15

        1.    Equitable tolling. .................................................. 16

        2.    Statutory tolling. ................................................. 18

    D.    Gladys is entitled to equitable tolling. .......................... 19

1. Gladys files a timely state petition and the court appoints Bret Whipple to represent her. ..20

2. Unbeknownst to anyone, Whipple is counsel on over 500 cases at the time he represents Gladys...................................................................22

3. Gladys never hears from Whipple after the court denied her petition in court and turns to help from the prison law library and other inmates..............................................................25

4. The prison failed to process Gladys's request for a financial certificate, delaying the filing of her petition........................................................33

5. Gladys reaches out to the state district court for information and explains that Whipple has disappeared.....................................................35

6. Discovery revealed Whipple's firm was disorganized, chaotic, and lacked the infrastructure for such a high-volume practice, which directly impacted Gladys...........39

   a. Whipple could locate none of the information the court ordered he provide..........................................................42

7. Whipple's abandonment and the prison's interference warrant equitable tolling. ..............52

E. Gladys is entitled to statutory tolling...........................56

Conclusion...............................................................................60

Form 8. Certificate of Compliance for Briefs ............................................1

iii

TABLE OF AUTHORITIES

CASES

*Bounds v. Smith*, 430 U.S. 817 (1977) ...................................................... 57

*Fixel v. U.S. Dist. Court of Nevada*, 1991 WL 42168 (9th Cir. 1991) ..... 59

*Fue v. Biter*, 842 F.3d 650 (9th Cir. 2016) ............................................... 17

*Gibbs v. Legrand*, 767 F.3d 879 (9th Cir. 2014) ..................................... 19

*Holland v. Florida*, 560 U.S. 631 (2010) ...................................... 16, 17, 19

*Johnson v. Moore*, 948 F.2d 517 (9th Cir. 1991) ..................................... 57

*Lewis v. Casey*, 518 U.S. 343 (1996) ....................................................... 57

*Lloyd v. Van Natta*, 296 F.3d 630 (7th Cir. 2002) .................................. 18

*Maples v. Thomas* 565 U.S. 266 (2012) ................................................... 19

*Miles v. Prunty*, 187 F.3d 1104 (9th Cir. 1999) ................................. 15, 58

*Murray v. Giarratano*, 492 U.S. 1 (1989) ............................................... 57

*Ocegueda v. Gentry*, 2:15-cv-01884-JCM-GWF ..................................... 59

*Pace v. DiGuglielmo*, 544 U.S. 408 (2005) .............................................. 16

*Roe v. Flores-Ortega*, 528 U.S. 470 (2000) ............................................. 38

*Rudin*, 781 F.3d 1043 (9th Cir. 2014) ...................................................... 19

*Sanders v. Williams*, 2015 WL 5256857 (D. Nev. 2015) ......................... 59

*Sossa v. Diaz*, 729 F.3d 1225 (9th Cir. 2013) ......................................... 17

*Spitsyn v. Moore*, 345 F.3d 796 (9th Cir. 2003) ...................................... 14

*Towery v. Ryan*, 673 F.3d 933 (9th Cir. 2012) ........................................ 19

*Whalen/Hunt v. Early*, 233 F.3d 1146 (9th Cir. 2000) ........................... 18

iv

*Wood v. Spencer*, 487 F.3d 1 (1st Cir. 2007) ........................................... 18

STATUTES

28 U.S.C. § 1291 ................................................................................... 1

28 U.S.C. § 1915(a)(2) ........................................................................ 59

28 U.S.C. § 2241 ................................................................................... 1

28 U.S.C. § 2244(d)(1)(A) ............................................................ 15, 16

28 U.S.C. § 2244(d)(1)(B) ................................................................. 18

28 U.S.C. § 2253 ................................................................................... 1

28 U.S.C. § 2254 ..................................................................... passim

RULES

Local Rule LSR 1-2 ............................................................................ 59

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 2241, 2254. On February 2, 2022, the district court issued a written order granting Respondent Gabriela Najera's motion to dismiss and denying Gladys a certificate of appealability.[1] The court issued judgment the same day.[2]

Gladys timely filed a notice of appeal on February 24, 2022.[3] This Court issued a certificate of appealability on August 30, 2022.[4] This Court has jurisdiction under 28 U.S.C. §§ 1291, 2253.

## STATEMENT OF THE ISSUES

Gladys filed her petition one week late, of that there is no dispute. Rather, the dispute centers on whether Gladys's petition should still be heard. Below, she argued she overcame the statute of limitations either because she is actually innocent or because she is entitled to tolling. Here, she focuses on tolling.

This case asks one question: "whether the district court properly

---

[1] 1-ER-2–15.

[2] 1-ER-16.

[3] 9-ER-2027.

[4] Dkt. 7-1.

1

dismissed appellant's 28 U.S.C. § 2254 petition as untimely, including whether equitable tolling is warranted."[5]

## STATEMENT OF THE CASE

### A.    Anthony Colon kills C.F.

On the day police arrested her in California, Gladys had a black eye and large bruise on her chest.[6] In that single booking photo, Gladys's story was laid bare: she was beaten, exhausted, frightened, and grieving.



---

[5] Dkt. 7-1 at 1.

[6] 8-ER-1755.

2

Two months earlier in Las Vegas, on January 11, 2006, Anthony Colon, Gladys's boyfriend, beat and strangled Gladys until she passed out repeatedly. At the same time, he attacked her daughter, C.F., throwing her into a couch. When Gladys came to, she saw that her daughter was unresponsive. Clinging to hope that she was going to be OK, Gladys went to Walgreens for medicine.[7] When she returned, C.F. was worse. Gladys insisted they take her to the hospital. When they arrived at UMC, Colon refused to take her in because there were cameras that would identify him. Instead, he drove to Cordova apartments, and put C.F. in a dumpster. Gladys could do nothing.

Colon insisted they run. To ensure Gladys's compliance, he took Gladys's oldest daughter L.F., and insisted Gladys follow behind in another car.

The next day, Enrique Reyes, who was looking through the dumpster for salvageable electronics, found C.F.'s body in a box and called police.[8] There was no identification, so law enforcement began

---

[7] 8-ER-1749.

[8] 8-ER-1667.

3

calling her Jane Cordova Doe because she was found at Cordova apartments. Detectives tried to identify her, but couldn't.[9] They launched a media campaign, posted fliers in English and Spanish, and sought information from informants, and ran television and radio ads seeking help.

On the run, Colon dragged his two daughters, Gladys, and her daughter Lesley, to Portland Oregon, Gresham Oregon, Minneapolis, Minnesota, and finally Colorado.[10]

Back in Los Angeles, Gladys's mother, Lilia, didn't know Gladys had left L.A. with her daughters.[11] In early February, after getting a concerned call from one of Gladys's friends, Lilia filed a missing person's report at the Porterville, California police department for Gladys, C.F., and L.F.[12] Police paid little attention to the report.

With her mother's help, Gladys was eventually able to escape to

---

[9] 8-ER-1754.

[10] 8-ER-1751–1753.

[11] 5-ER-981.

[12] 8-ER-1753–1754.

4

her mother's California home with L.F.[13] Gladys's mother, Lilia called

offers to tell them Gladys was home with L.F.[14] A California detective

arrived at Lilia's before the Las Vegas detectives. When he saw her

condition, he called for an ambulance and had her taken to the hospital.

She was arrested the next day. Detectives found Colon in Minneapolis

and arrested him.[15]

The state charged Gladys with first-degree murder by child abuse,

second-degree murder by child neglect, and child neglect resulting in

substantial bodily harm.[16] The complaint hinted at the state's theory: if

Gladys didn't kill C.F. directly, then she surely was responsible because

she placed C.F. in Colon's care knowing, or at least suspecting, that he

had abused C.F. in the past.

## B.    Gladys is forced into a joint trial with her abuser, who is facing death.

It took two years to get the cases to trial, but the jury never heard

the story behind Gladys's booking photograph—at least not the real

---

[13] 8-ER-1754–1755.

[14] 8-ER-1755.

[15] 8-ER-1759.

[16] 8-ER-1748.

story.

The court forced Gladys to go through a joint trial with the man who beat her, killed her child, and who was facing the death penalty. It gutted her defense, preventing her from putting on evidence to prove how abusive Colon was at the time of C.F.'s death and two years later, during trial.[17]

When not hamstrung by the court, defense counsel tried to get Colon's invasive control and violence against women before the jury. But it did so in a way that harmed Gladys, rather than helped her. The defense recognized early that Gladys was a victim of domestic abuse and hired two mental health experts, Dr. John Paglini and Dr. Louis Mortillaro.[18] It expected Dr. Mortilarro to be their "domestic violence" expert.[19] Less than a month before trial, Dr. Mortillaro backed out of the case citing a new heart condition.[20] Rather than ask the court for more time to find a new domestic violence expert, defense counsel

---

[17] *See* 8-ER-1760–1785.

[18] 5-ER-997–998.

[19] 5-ER-997

[20] 5-ER-998.

6

turned to Dr. Paglini, who was unprepared, unqualified, and, ultimately a disaster on the stand.[21]

Prosecutors took full advantage. The state pressed a theory of the case that it knew would resonate emotionally with jurors, but which lacked a legal basis. It painted Gladys as a woman who "chose" Colon over her daughter and fought every attempt Gladys made to tell her story of abuse. It was successful. No court—and certainly no jury—has ever heard the complete story. Unless this Court grants relief so that Gladys's claims can be heard on the merits, that will go unchanged.

After a 22-day trial, the jury convicted both Colon and Gladys of first-degree murder.[22] It sentenced Colon to life without the possibility of parole, and sentenced Gladys to life with the possibility of parole.[23]

---

[21] 5-ER-998.

[22] 8-ER-1831; 8-ER-1829 (Colon verdict).

[23] 8-ER-1831 (verdict); 8-ER-1829 (Colon verdict). The jury also found Gladys guilty of the remaining counts: child neglect resulting in substantial bodily harm and child abuse resulting in substantial bodily harm. 10-ER-2058. The court sentenced Gladys on these counts to 60-to-240 months in prison concurrent to one another, but consecutive to 20-to-life for first-degree murder. 10-ER-2068.

Gladys timely appealed.[24] After briefing, the Nevada Supreme Court denied relief.[25]

Gladys timely filed a state post-conviction petition,[26] and asked for counsel,[27] which the court granted, appointing Bret Whipple.[28] The court denied her petition without a hearing.[29] Whipple never appealed, though Gladys instructed him to do so. Gladys filed a *pro se* notice of appeal on September 25, 2014, but it appears it never made it to the Nevada Supreme Court because there is no record of a case in that court.[30]

## C.    Gladys litigates a habeas petition in federal court.

Gladys filed a *pro se* § 2254 petition and motion for the

---

[24] 8-ER-1824. *See also* 8-ER-1736–1823.

[25] 1-ER-82–110. *See also* 8-ER-1736–1823; 8-ER-1657–1735; 8-ER-1613–1656.

[26] 7-ER-1556–1566.

[27] 7-ER-1569–1570; 7-ER-1567–1568.

[28] 7-ER-1499–1516.

[29] 5-ER-1123–1137.

[30] 5-ER-1119 (located on the "left side" of the file in the state district court).

appointment of counsel on December 3, 2014 by mail. [31] The district court initially denied her request for counsel, but after Gladys filed her response to this Court's Order to Show Cause about the timeliness of her petition, it appointed counsel.

Gladys filed a counseled amended petition, which Najera moved to dismiss, raising every procedural defense it could.[32] Gladys countered.[33] As it relates to the statute of limitations, Gladys argued she was actually innocent, and alternatively, she was entitled to equitable tolling.[34]

### D. The lower rejected Gladys's tolling arguments based on interference from prison officials but granted her discovery to develop evidence that Whipple abandoned her.

The lower court found that Gladys's claims about the prison "do not demonstrate an entitlement to relief."[35] However, it found "limited discovery is appropriate to ensure that facts alleged in Perez's tolling

---

[31] 5-ER-1026–1109.

[32] 4-ER-662–785.

[33] 3-ER-481–575, 3-ER-612–641, 3-ER-579–588.

[34] 3-ER-501–544.

[35] 1-ER-77.

9

claims regarding post-conviction counsel are fully developed."[36] It
allowed Gladys to subpoena information from the Nevada Department
of Corrections and Whipple.[37]

Gladys had no trouble obtaining the information from the
Department, but Whipple was another story. Whipple several times
refused to comply with the subpoenas Gladys served.[38] It culminated in
an order to show cause and a hearing at which Whipple testified.[39]

The court permitted supplemental briefing following Whipple's
testimony.[40] Gladys argued that she was entitled to equitable tolling
based on Whipple's abandonment.[41]

---

[36] 1-ER-75.

[37] *See* 1-ER-79–81 (listing the information Gladys was entitled to
obtain).

[38] *See* 2-ER-275–288 (Unopposed Motion to Compel Discovery from
Attorney Bret Whipple); 2-ER-270–274 (granting the motion to compel);
2-ER-255–266 (Unopposed Application for an Order to Show Cause
Regarding Discovery from Attorney Bret Whipple); 2-ER-247–253
(Order to Show Cause Why Bret Whipple Should not be Held in
Contempt); 2-ER-241–246, 254, 237–240) (Proof of service, errata order,
proof of service of errata order).

[39] 2-ER-247–253,1-ER-19–53.

[40] 2-ER-199–200, 196.

[41] 2-ER-163–184.

10

### E.    The lower court grants Najera's motion to dismiss.

The district court rejected Gladys's actual innocence argument without an evidentiary hearing.[42] It also rejected Gladys's equitable tolling arguments. The court found "the prison did not prevent her from presenting her claims 'in *any* form, to *any* court.'"[43] And even assuming Whipple abandoned Gladys, the court concluded she had not demonstrated "that her untimeliness in filing the federal petition was caused by an external impediment, rather than her own lack of diligence."[44] It further found Gladys failed to demonstrate "the necessary causal link between Whipple's alleged inaction and the untimeliness of her federal petition."[45]

The court declined to grant Gladys an evidentiary hearing on her innocence and tolling arguments because it resolved the questions "on the briefing of the parties and on the extensive record before the court,

---

[42] 1-ER-2–7.

[43] 1-ER-77 (original emphasis), *citing Ramirez v. Yates,* 571 F.3d 993, 1001 (9th Cir. 2009).

[44] 1-ER-12.

[45] 1-ER-13.

11

without need for further factual development."[46]

## SUMMARY OF THE ARGUMENT

Gladys is entitled to equitable and statutory tolling.[47] Whipple's abandonment and interference by prison officials prevented Gladys from timely filing her petition.[48]

Whipple's failures are directly related to Gladys missing her federal deadline by a week. Whipple was mostly absent throughout his representation of Gladys in her state post-conviction proceedings. He rarely appeared in court on her behalf. He completely failed to investigate her case, and instead filed a petition that raised three weak record-based ineffective assistance of counsel claims. He didn't appeal when Gladys told him to because he didn't think she was serious about it.[49]

Whipple runs a high-volume firm with only law students and brand-new lawyers to help. At the time he represented Gladys, he was

---

[46] 1-ER-13–14.

[47] 3-ER-527–544; 2-ER-163–184.

[48] 3-ER-527–544; 2-ER-163–184.

[49] 4-ER-654 at ¶ 16.

12

counsel on an astounding 592 cases. It's no wonder Gladys couldn't reach him by phone, or that Whipple never kept Gladys informed about her case or sent her a copy of the state court's denial of her post-conviction petition. During discovery, Whipple revealed that he doesn't have any electronic records, kept no letters, notes, or research in Gladys's file, and in fact, stores his prior client files in 18-wheelers on a ranch outside of Las Vegas.

Once Gladys figured out Whipple never filed the appeal she asked him to file, she tried to file the appeal herself and figure out how to file a federal petition. At the time, the law library at Florence McClure Correctional Center, where she is incarcerated, had no statutes, the wrong forms, and was often closed. Gladys did the best she could with the help of other inmates. Gladys went through the proper channels at the prison to file her petition by mail with the required financial certificate, but the business office never processed her request, and only informed Gladys of that fact when she asked. She redid the request as soon as possible, but by then her petition was late.

As demonstrated here, this Court should reverse because Gladys is entitled to tolling and to have the merits of her claims heard. But

13

should this Court find more evidence is warranted, it should at least remand for an evidentiary hearing, something Gladys sought but was denied.

ARGUMENT

## I. Gladys's petition is not barred by the AEDPA's statute of limitations.

Gladys filed her petition late, but that doesn't automatically mean her petition should have been dismissed as untimely. Gladys overcomes the statute of limitations because she is entitled to tolling—both equitable and statutory—based on her attorney's abandonment and the prison's interference. The lower court's contrary conclusions were wrong, and this Court should reverse. At a minimum it should reverse so that Gladys can prove up these claims in an evidentiary hearing.

### A. This Court reviews this case *de novo*.

This Court reviews *de novo* the dismissal of a federal petition as untimely. *Spitsyn v. Moore*, 345 F.3d 796, 799 (9th Cir. 2003). This Court also reviews *de novo* the question of whether AEDPA's statute of limitations should be tolled. *Id.* "If the facts underlying a claim for equitable tolling are undisputed, the question of whether the statute of limitations should be equitably tolled is reviewed *de novo*. Otherwise,

14

findings of fact made by the district court are to be reviewed for clear error." *Id.*, *citing Miles v. Prunty*, 187 F.3d 1104, 1105 (9th Cir. 1999).

## B. The parties agree that Gladys filed her federal petition one week late.

AEDPA controls Gladys's petition. *See* 28 U.S.C. § 2244(d)(1)(A). Najera and Gladys agree on the math. Gladys's case became final on May 24, 2012, and 89 days passed before she filed her timely state post-conviction petition, which tolled her federal habeas clock.[50] Gladys didn't file an appeal from the denial of her state post-conviction petition because her attorney abandoned her. *See* Section I(D)(3), *infra*. As a result, her clock began running again on February 24, 2014—when the date for filing a notice of appeal passed.[51] As Najera explained below, Gladys's time expired on December 1, 2014, and she filed mailed her petition on December 8, 2014.[52]

## C. The tests for tolling.

Under AEDPA, an inmate normally has one year from the date

---

[50] *See* 4-ER-776.

[51] 4-ER-776.

[52] 4-ER-776, 5-ER-1019.

15

her state conviction becomes final to file a federal habeas petition. 28 U.S.C. § 2244(d)(1)(A). The limitations period is tolled while a defendant pursues a properly filed petition for state post-conviction relief. *Id.*; *see also* § 2244(d)(2).

### 1. Equitable tolling.

AEDPA's one-year statute of limitations is subject to equitable tolling. *Holland v. Florida*, 560 U.S. 631, 649 (2010). To qualify for tolling, a petitioner must show he was reasonably diligent in pursuing his habeas remedy and that "'some extraordinary circumstance stood in his way' and prevented timely filing." *Id.*, *quoting Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005).

This Court recently clarified the test for equitable tolling after acknowledging that its cases on the topic "have not been particularly clear and point in opposite directions." *Smith v. Davis*, 953 F.3d 582, 589 (9th Cir. 2020). Out of *Smith* comes "two related holdings." *Id.* at 598. First, to demonstrate diligence, the habeas petitioner "must show that he has been reasonably diligent in pursuing his rights not only while an impediment to filing caused by an extraordinary circumstance existed, but before and after as well, up to the time of filing his claim in

16

federal court." *Id.* at 598–99. Though this Court rejected a "stop-clock approach," it was clear that diligence remains "'reasonable diligence,' not 'maximum feasible diligence.'" *Id.* at 599*, quoting Holland*, 560 U.S. at 653. "What we make clear is that it is not enough for a petitioner seeking an exercise of equitable tolling to attempt diligently to remedy his extraordinary circumstances; when free from the extraordinary circumstance, he must also be diligent in actively pursuing his rights." *Id.*

"Second, and relatedly, it is only when an extraordinary circumstance prevented a petitioner acting with reasonable diligence from making a timely filing that equitable tolling may be the proper remedy." *Id.* at 600. This Court's analysis remains flexible and fact-specific. *Id.* "To be clear, this rule does not impose a rigid 'impossibility' standard on litigants, and especially not on 'pro se prisoner litigants— who have already faced an unusual obstacle beyond their control during the AEDPA limitation period.'" *Id.*, *citing Fue v. Biter*, 842 F.3d 650, 657 (9th Cir. 2016), *quoting Sossa v. Diaz*, 729 F.3d 1225, 1236 (9th Cir. 2013). Equitable tolling remains a fact-specific inquiry, not bound by "'mechanical rules.'" *Id., quoting Holland*, 560 U.S. at 649–50.

17

## 2. Statutory tolling.

The statute of limitations does not begin to run until any unlawful state-created impediment preventing a petitioner from seeking relief has been removed. 28 U.S.C. § 2244(d)(1)(B). Although § 2244(d)(1)(B) does not define impediment, courts have held that an impediment must "prevent" the petitioner from timely filing her federal habeas petition and the impediment must be beyond the petitioner's control. *Wood v. Spencer*, 487 F.3d 1, 7 (1st Cir. 2007) (concluding that where a petitioner had "the power to blunt the effect of any state-created impediment" with "garden-variety diligence" tolling under § 2244(d)(1)(B) is not appropriate); *see also Lloyd v. Van Natta*, 296 F.3d 630, 633 (7th Cir. 2002) (concluding that the state's failure to provide petitioner with a complete transcript of his trial did not prevent him from filing his federal petition because the transcript was not needed to raise the claim in his federal petition). Under some circumstances, however, the absences from a prison law library of basic and essential legal materials such as the AEDPA itself may constitute an impediment within the meaning of the statute. *Whalen/Hunt v. Early*, 233 F.3d 1146, 1148-1149 (9th Cir. 2000).

18

**D.     Gladys is entitled to equitable tolling.**

Attorney misconduct can rise to the level of extraordinary circumstances for purposes of equitable tolling. There is a difference between "garden variety" attorney negligence (like miscalculating a deadline) and misconduct that amounts to abandonment. *See Holland*, 560 U.S. 631, 657 (2010) (Alito, J. concurring); *Maples v. Thomas* 565 U.S. 266, 282–283 (2012). Unlike regular attorney negligence, which is attributed to the client under agency principles, "a client cannot be charged with the acts or omissions of an attorney who has abandoned him." *Maples*, 565 U.S. at 283. "An attorney's failure to communicate about a key development in his client's case can, therefore, amount to attorney abandonment and thereby constitute an extraordinary circumstance." *Gibbs v. Legrand*, 767 F.3d 879, 886 (9th Cir. 2014), *citing Maples*, 565 U.S. at 282-283; *Rudin*, 781 F.3d 1043, 1054-1056 (9th Cir. 2014). *But see Towery v. Ryan*, 673 F.3d 933, 942-43 (9th Cir. 2012) (finding no attorney abandonment when the attorney continued to diligently pursue habeas relief on Towery's behalf).

Gladys's entitlement to tolling is described below as well as Gladys's actions in support of diligence. In total, Gladys demonstrates

19

extraordinary circumstances prevented her from timely filing her petition and she acted diligently, and tolling is warranted.

### 1. Gladys files a timely state petition and the court appoints Bret Whipple to represent her.

Gladys filed a timely state post-conviction petition, a motion seeking withdrawal of her prior attorneys, and a motion asking for counsel. [53] At a hearing without Gladys, the court granted her motion, removing her trial attorneys and setting the matter over for two weeks to confirm counsel. [54] At that next hearing, again without Gladys,[55] Whipple appeared and confirmed he was counsel. [56] Whipple asked for a month to get up to speed, and the court agreed. [57] This hearing would be one of only two in the entire state post-conviction case that Whipple would attend.

At the next hearing, Whipple sent Attorney Douglas A. Nutton in

---

[53] 7-ER-1556–1570.

[54] 10-ER-2072.

[55] 10-ER-2074.

[56] 10-ER-2074.

[57] 10-ER-2074.

his place.[58] Nutton asked for nine months to a year to file a supplemental petition.[59] The court found that request "not reasonable" and gave him one month.[60]

Whipple asked to extend this deadline.[61] In the last hearing where Whipple would appear, Whipple asked the court for two more months.[62] The court agreed.[63]

Whipple eventually filed a supplemental petition,[64] though it's not one he actually drafted.[65] Whipple did no investigation and raised only three record-based ineffective assistance of counsel claims for: (1) incorrectly advising Gladys regarding her proffer; (2) "providing proffer to co-defendant violated due process"; and (3) failing to make a proffer

---

[58] 10-ER-2076–2079.

[59] 10-ER-2077.

[60] 10-ER-2077–2078.

[61] *See* 7-ER-1518–1520 (motion); 7-ER-1517 (minutes of hearing); 10-ER-2080–2082 (transcript of hearing).

[62] 10-ER-2081.

[63] 10-ER-2081.

[64] 7-ER-1499–1516.

[65] *See* 2-ER-214 at ¶ 23, 1-ER-30.

21

to the court of the excluded witness testimony.[66]

Although the state filed a response opposing the petition, Whipple never filed a reply.[67]

The court held a hearing on December 5, 2013, on Gladys's petition.[68] Gladys was present,[69] but once again, Whipple was not.[70] This time he sent Attorney Michael I. Sandoval.[71] The court denied the petition and ordered the state to prepare the order.[72] Gladys was told that Whipple would write to her and explain her options going forward.[73]

### 2. Unbeknownst to anyone, Whipple is counsel on over 500 cases at the time he represents Gladys.

Whipple was counsel of record on an astounding 592 cases while he represented Gladys. His firm, Justice Law Center, didn't have the

---

[66] 7-ER-1499–1516.

[67] 7-ER-1485–1496.

[68] 10-ER-2083–2094.

[69] 10-ER-2093–2094.

[70] 10-ER–2083–2094

[71] 10-ER-2084.

[72] 10-ER-2093.

[73] 4-ER-651 at ¶ 6(1).

22

infrastructure to support such a case load. Whipple ran his high-volume firm by hiring law students as clerks and brand-new lawyers to do all the legal work, mostly unsupervised. Jeb Bond, who started with Whipple as a law student and stayed on after he became a lawyer, described the lack of organization within Whipple's firm. He explained Whipple took a supervisory role, leaving law clerks and brand-new lawyers to draft pleadings he would later file under his own name.[74] And these same law clerks and new attorneys were responsible for reviewing the record in post-conviction cases.[75] Whipple "rarely drafted pleadings from scratch. He would review and approve the work the law clerks did on the case. Nothing got filed unless [Whipple] or another attorney reviewed and approved it—[Whipple] was the one who signed the pleadings."[76]

Whipple often has "a number of appearances" in multiple places at once, so he and his team would decide who would cover what hearing

---

[74] 2-ER-214 at ¶¶ 22, 23.

[75] 2-ER-214 at ¶ 23.

[76] 2-ER-214 at ¶ 23

the night before.[77] His days were seemingly spent racing from one courtroom to the next, [78] with little time to communicate with clients or review cases.

By Gladys's count, Whipple was counsel of record on at least 592 cases from 2012 through 2014 while he represented Gladys:

- 211 cases in the Second Judicial District (Washoe County).[79]

- 22 cases in the Seventh Judicial District (White Pine County).[80]

- 293 cases in the Eighth Judicial District (Clark County).[81]

- 24 cases in the Nevada appellate courts.[82]

- 42 cases in the federal district court.[83]

---

[77] 1-ER-34.

[78] 1-ER-34.

[79] 2-ER-297–309.

[80] 2-ER-267–269. This list was generated in response to an open records request by members of the clerk's office. For that reason, it captures all of the cases from Justice Law Center, rather than just Whipple's name. *Id.*

[81] 2-ER-310–326.

[82] 2-ER-191–195. This list was generated by searching Whipple's name. The Nevada Supreme Court website does not permit a search to be limited by dates. Counsel highlighted the cases that were open at the same time Whipple represented Gladys.

[83] 2-ER-187–190.

24

He explained his practice: "[a] lot of the work I do doesn't take a lot of time. You're just there to show up to see if the client did the things that they're supposed to do…I mean, it's very simple."[84] Of course, this isn't completely true. As described below, at the time Whipple represented Gladys, he was involved in several complex matters, including death penalty cases. His unmanageable caseload led him to abandon Gladys. *See* Section I(D)(6), *infra*.

### 3. Gladys never hears from Whipple after the court denied her petition in court and turns to help from the prison law library and other inmates.

At Gladys's state post-conviction hearing, Sandoval told Gladys Whipple would send her a letter explaining her options going forward.[85] Whipple never sent such a letter and she couldn't reach Whipple to find out what was happening on her case.[86]

Whipple recalled meeting Gladys at prison and that "she called

---

[84] 1-ER-41.

[85] 4-ER-653 at ¶ 7.

[86] 4-ER-653 at ¶ 5. *See also* 5-ER-1018–1019 (Gladys's affidavit filed in state court describing Whipple's abandonment).

fairly frequently," but couldn't recall a timeline for her calls.[87] About filing a notice of appeal for Gladys, he said he doesn't remember if she asked him to file one.[88] "If she would have I would like to think that I would have, but I'm not a perfect person and I do not – my work is not perfect either. I just do the best I can under all circumstances."[89]

Gladys recalls telling Whipple "on several occasions that she was fighting for her life and wanted to continue to fight her case by appeals and any means necessary."[90] Gladys told Whipple that before the state court denied her post-conviction petition because that is the only time Gladys spoke to him. Whipple testified: "I just know that she was one that would reach out and call periodically and I would talk to her. And, you know, sometimes she would catch me in an office and sometimes

---

[87] 1-ER-31. NDOC records show Gladys called Whipple's office twice on March 18, 2014, once on April 1, 2014, six times on April 3, 2014, and once each on April 4, April 7, and April 8, 2014. 7-ER-1369–1371. She called his office and spoke to someone on Jun 24, 2014, July 28, 2014 and August 6, 2014 before giving up trying to reach Whipple. 7-ER-1392, 1394, 1397.

[88] 1-ER-31.

[89] 1-ER-31.

[90] 5-ER-1018.

26

she wouldn't."[91] The calls had to be before the decision because there is no evidence that Whipple ever contacted Gladys after the decision to provide her a copy of it or to counsel her on her options.[92]

Left on her own, Gladys turned to the prison law library and other inmates for help. The problem was that the Florence McClure Women's Correctional Center (FMWCC) law library was undergoing problems with staffing.

The law library was originally located in the chapel.[93] When it was there, 10 to 12 inmates could use the library at a time.[94] The library had two computer stations available for legal research as well as books.[95] NDOC staff watched over inmates using the library from an office adjacent to the chapel.[96]

---

[91] 1-ER-31.

[92] *See* 2-ER-291 at ¶ 15. Yanez's declaration describes finding no letters, notes, or research generated by Whipple's firm in his file. 2-ER-289–292.

[93] 4-ER-647 at ¶ 4(7).

[94] 4-ER-647 at ¶ 4(7).

[95] 4-ER-647 at ¶ 4(7).

[96] 4-ER-647 at ¶ 4(7).

During 2013 and 2014, the FMWCC law library underwent a great deal of turnover.[97] It began when the civilian law librarian, Lori Hamilton, left the position. The next person NDOC hired was later discharged,[98] and the opening remained unfulfilled until October 2014, when the current librarian, Cindy Ruiz was hired.[99] Although hired in October, Ruiz didn't begin working until December because of training and the holidays.[100]

It was also in 2014, that all of the law library books were removed[101] in favor of computers with Lexis Nexis.[102] It was also during this year, with the librarian position vacant, that use of the law library became extremely difficult.[103] Because there was no law librarian, the

---

[97] 4-ER-647 at ¶ 4(9).

[98] Inmate law clerk Rosemary Vandecar believes this person was "discharged for having an inappropriate relationship with an inmate." 4-ER-647 at ¶ 4(9). Should this Court grant Gladys an evidentiary hearing, she would attempt to confirm this.

[99] 4-ER-647 at ¶ 4(9).

[100] 4-ER-647 at ¶ 4(10). *See also* 4-ER-658 at ¶ 5.

[101] 4-ER-647 at ¶ 4(8).

[102] 4-ER-647 at ¶ 4(8).

[103] 4-ER-646–652, 4-ER-658–659. *See also* 4-ER-658 at ¶ 6.

library was only open (and available to inmates) if a NDOC staff person was available to supervise.[104] If a staff person wasn't available, then the library remained closed.[105] During 2013 to 2014 when there was no librarian, there also was no single, dedicated substitute staff person responsible for opening the library.[106] Whether the library would be open and for how long changed day to day.[107] If a staff person was available to supervise, the law library would be open. If there wasn't, it would be closed.[108] There was no predicting it—the library might be open for two hours one day, three hours the next.[109]

Assistant Warden of Programs Tanya Hill oversaw the library.[110] She believed that the law library didn't need to be open daily and it was OK for it to remain closed for days at a time.[111] During 2013 to 2014, it

---

[104] 4-ER-647 at ¶ 4(12).

[105] 4-ER-647 at ¶ 4(12).

[106] 4-ER-647 at ¶ 4(13).

[107] 4-ER-647 at ¶ 4(14).

[108] 4-ER-647–648 at ¶ 4(15).

[109] 4-ER-647–648 at ¶ 4(15).

[110] 4-ER-648 at ¶ 4(16).

[111] 4-ER-648 at ¶ 4(18).

29

was extremely difficult to get an appointment to use the law library, which is the only way an inmate could visit the library.[112] An inmate got an appointment—then and now—by requesting an appointment in writing through a "kite."[113] The kite must include the inmate's name, NDOC number, case number, and reason for the appointment, or the inmate risked having the request denied.[114] If a request to use the library was approved, the inmate likely wouldn't receive an appointment for weeks and the appointment was only for one hour.[115] At the time, there were only two functioning computers with LexisNexis.[116] And unless an inmate knew exactly what she was looking for it, it was very difficult to find anything.[117]

The law library didn't have updated forms—law clerk Rosemary Vandecar described what they did have then as "limited and terribly

---

[112] 4-ER-648 at ¶ 4(21). *See also* 4-ER-658–659 at ¶ 8.

[113] 4-ER-648 at ¶ 4(20).

[114] 4-ER-648 at ¶¶ 4(20-21).

[115] 4-ER-648 at ¶ 4(22). *See also* 4-ER-659 at ¶ 9.

[116] 4-ER-648 at ¶ 4(22).

[117] 4-ER-649 at ¶ 4(23). Vandecar isn't sure they even had a complete set of Nevada statutes then. *Id.*

outdated"[118]—and the forms it did have were created by law library staff.[119]

Gladys asked around for help and was introduced to Vandecar through Julia Jarrell.[120] Vandecar recalls that Gladys didn't know how to use the computer or Lexis, and Vandecar had to help her.[121] Gladys's federal petition was one of the first ones Vandecar ever worked on.[122] As Vandecar remembers it, at the time they didn't have "all the forms or any instructions on how to file a federal habeas petition. They had to figure it out themselves."[123]

Gladys began her attempts to timely file her petition by first requesting the necessary forms.[124] The form arrived around October 29, 2014, without instructions.[125] The form the library gave her is the form

---

[118] 4-ER-649 at ¶ 4(24).

[119] 4-ER-649 at ¶¶ 4(24-25).

[120] 4-ER-658–659; 4-ER-649 at ¶ 4(28).

[121] 4-ER-649 at ¶ 4(29).

[122] 4-ER-649 at ¶ 4(31).

[123] 4-ER-649 at ¶ 4(30).

[124] 3-ER-537, 4-ER-653 at ¶ 10.

[125] 3-ER-537, 4-ER-654 at ¶ 14. 4-ER-654 at ¶ 14, 5-ER-1122.

Gladys used to file her petition.[126] As the lower court pointed out, it was not the proper form.[127]

When it came to deciding what claims to include, Vandecar said that she and Gladys chose to list the claims from Gladys's direct appeal brief "so it was clear that they were including everything from the direct appeal and were being all inclusive."[128] Vandecar and Gladys didn't know what information to include and nothing in the law library could help them figure it out.[129] Vandecar "knew they weren't allowed to include citations or case law, so listing the issues exactly as they were in the brief was the closest they could do. She knew that if they attached the entire brief, which included citations to statutes and cases, it would be rejected for including case law."[130] Because the law library's hours were so sporadic, she and Gladys worked on Gladys's petition

---

[126] 3-ER-537, 4-ER-654 at ¶ 14.

[127] 3-ER-537.

[128] 4-ER-650 at ¶ 4(33).

[129] 4-ER-650 at ¶ 4(34).

[130] 4-ER-650 at ¶ 4(34).

32

mostly in their cells.[131] She doesn't know if Gladys had her entire file when they worked.[132]

In fact, Gladys didn't have her entire file. Inmates were not allowed to have more than one legal box at a time in their cells.[133] Gladys was permitted two boxes total, with one being for legal work.[134] If Gladys's legal box was full and she wanted something else, she had to take something out of her box to make room, either by throwing it away or mailing it to family.[135]

### 4. The prison failed to process Gladys's request for a financial certificate, delaying the filing of her petition.

Gladys first sought a financial certificate in order to file her petition on November 12, 2014, more than two weeks before her petition

---

[131] 4-ER-650 at ¶ 4(35). *See also* 4-ER-658 at ¶ 7.

[132] 4-ER-650 at ¶ 4(35).

[133] 4-ER-654 at ¶ 18.

[134] 4-ER-654 at ¶ 18.

[135] 4-ER-654 at ¶ 18. To be sure, Whipple never sent Gladys a copy of her file. He wouldn't even turn it over to counsel when asked. The court had to order Whipple to provide it. 1-ER-80.

was due.[136] She was told—on November 20, 2014—that it was done.[137] But when Gladys still hadn't received it,[138] she asked again on November 23, 2014 for the prison to process her financial statement so she could file her § 2254 petition.[139] More than a week later, prison officials responded that the request was submitted to inmate banking on December 1, 2014.[140] On the same date, Gladys wrote a kite for an appointment to mail her petition.[141] She titled it "Time Sensitive" and explained that she needed an appointment "as soon as possible" to mail documents to this Court.[142]

Gladys dated her pleadings for December 3, 2014, because she was anticipating that her library appointment would be that day.[143] But instead on that day, she was told she couldn't mail her federal petition

---

[136] 5-ER-1114.

[137] 5-ER-1114.

[138] 4-ER-654 at ¶ 19.

[139] 5-ER-1112.

[140] 5-ER-1112.

[141] 5-ER-1111.

[142] 5-ER-1111.

[143] 4-ER-651 at ¶ 6(2). *See also* 5-ER-114, 1112.

because there was a delay in processing her financial certificate.[144]

Gladys learned that the law library was closed on Friday, December 5, 2014, and the first available appointment she could receive with "substitute staff," was on December 8, 2014.[145]

Because the law library was rarely open, had unpredictable hours, had inadequate resources, and because the business office didn't process Gladys's request for a financial certificate, making her redo the request causing a delay, she is entitled to equitable tolling. Had the business office provided Gladys with her financial certificate on November 20, 2014, as they originally said, [146] her petition would have been timely.

### 5. Gladys reaches out to the state district court for information and explains that Whipple has disappeared.

On November 15, 2014, Gladys wrote to the court for records, specifically asking for a copy of the order denying her post-conviction petition.[147] The clerk's office didn't file that letter for reasons that are

---

[144] 4-ER-651 at ¶ 6(2). *See also* 5-ER-114, 1112.

[145] 4-ER-655 at ¶ 23.

[146] 5-ER-1114.

[147] 5-ER-1113.

35

unknown. If it was because Whipple was still her attorney of record, Gladys sought to remedy that a few weeks later on December 3, 2014—the same day she originally tried to mail her federal petition, but was thwarted by the prison.[148] The clerk's office opted not to file that request either.[149] Two weeks later, Gladys filed another request asking for records—this time seeking transcripts—and again moved to have Whipple withdrawn as her attorney.[150] She accompanied this request with an affidavit.[151] She explained that she had "no denial documents."[152] Gladys asserted that she told Whipple "on several occasions that she was fighting for her life and wanted to continue to fight her case by appeal and all means necessary."[153] Gladys thought Whipple was doing just that.[154] Gladys noted that she asked the court

---

[148] 5-ER-1110.

[149] 5-ER-1110.

[150] 5-ER-1020–1025.

[151] 5-ER-1018–1019.

[152] 5-ER-1018.

[153] 5-ER-1018.

[154] 5-ER-1018.

for records, but hadn't received any yet.[155] Gladys was so diligent about requesting records because she thought that she couldn't file a federal petition without "all of [her] paperwork from the courts."[156]

Gladys averred that she spoke to Whipple on the phone and he told her he wasn't sure if Gladys was serious when she said she wanted to appeal or pursue possible federal habeas relief.[157] Gladys alleged this was a "serious breach and compromise to her due process" rights.[158] She believed "it [was] urgent that she get timely filing of her 2254 Petition for Writ of Habeas Corpus with the United States District Court."[159] She thought she could only do that "by withdrawing Bret Whipple esq. as counsel of record immediately, freeing her to timely file in U.S. District Court in pro per."[160]

Whipple had a duty to keep Gladys reasonably informed. At a

---

[155] 5-ER-1018.

[156] 4-ER-654 at ¶ 16.

[157] 5-ER-1018. Gladys didn't assert what date that call occurred on, writing "date" but then leaving it blank. 5-ER-1018.

[158] 5-ER-1019.

[159] 5-ER-1019.

[160] 5-ER-1019.

37

minimum, Whipple had a duty to provide Gladys with a copy of the written decision denying her petition.[161] Also at a minimum, Whipple had a duty to counsel Gladys on her next steps, including her right to appeal. Moreover, Whipple had a duty to file that notice of appeal and perfect the appeal at Gladys's insistence, whether he thought she was "serious" or had any chance of winning. *See Roe v. Flores-Ortega*, 528 U.S. 470 (2000). It's outrageous that an attorney would refuse to file a notice of appeal when instructed because he didn't think she was "serious"—particularly in a high-profile first-degree murder case.

The most likely scenario is not that Whipple thought Glady's wasn't serious about appealing, but that he just blew the deadline and came up this 'wasn't serious' explanation later. Little else makes sense. The post-conviction claims were meritorious enough to appear in the petition and to be argued for at the hearing. The court denied them on the merits—it didn't reject them as frivolous or barred. But without an

---

[161] Although the post-conviction decision includes a certification that it mailed a copy to Gladys, the mail logs that Najera turned over don't bear that out. According to the mail logs, Gladys received no mail near the day the court said it mailed the decision to Gladys. *See* 9-ER-1999–2027.

appeal, the court's decision denying the petition would control. And without an appeal, none of the claims raised on post-conviction would be available to Gladys on federal habeas. Whipple's failures—to meaningfully work on her case, to communicate with her, to provide her with a copy of the decision denying her post-conviction petition, and to perfect her appeal as she requested—demonstrate that he abandoned Gladys.

### 6. Discovery revealed Whipple's firm was disorganized, chaotic, and lacked the infrastructure for such a high-volume practice, which directly impacted Gladys.

As evidenced by Whipple's inability to appear in court on Gladys's behalf when required, Whipple spread himself too thin and Gladys suffered as a result. It was on this point that the lower court granted discovery, permitting Gladys to uncover "the total number of cases" Whipple's firm handled "in any court" during the time he represented Gladys, "including the number of capital cases handled during that time, and the individual caseloads of each attorney, investigator,

paralegal, or legal assistant who worked on Perez's case."[162]

Gathering this information took an extraordinary amount of effort. All told, Gladys served Whipple with a valid subpoena demanding this information three different times.[163] After he received the subpoena the first time, Whipple provided 8 boxes of Gladys's file but no other information.[164] After the court granted a motion to compel Whipple's compliance, Gladys served him with the subpoena a second time.[165] Whipple still didn't produce the required information, so Gladys

---

[162] 1-ER-80. The court also ordered Whipple to turn over Gladys's file, be it electronic or physical, disclose a list of people who worked at Whipple's firm and those who specifically worked on Gladys's case, and any billing or time-keeping records for anyone who worked on Gladys's case. *Id*.

[163] 2-ER-248 (Whipple was first served on October 4, 2019, but he only partially complied); 2-ER-249 (A Las Vegas investigator served Whipple in Las Vegas with another copy of the subpoena and the court's September 30, 2019 Order on January 16, 2020); 2-ER-246 (A Reno investigator served Whipple in Reno with a third copy of the subpoena, and copies of the court's orders dated September 30, 2019, January 16, 2020, and February 11, 2020).

[164] *See* 2-ER-279–283 (describing Gladys's efforts to obtain discovery and Whipple's failure to comply).

[165] 2-ER-249. As ordered, Gladys also personally served Whipple with a copy of the Court's September 30, 2019 Order granting discovery (found at 1-ER-59–81).

40

filed an application for an order to show cause, which the court granted.[166] Gladys again served Whipple with the subpoena and the court's prior order demanding his compliance.[167]

In response to the lower court's Order to Show Cause, Whipple filed a declaration swearing that he had no records detailing the number of cases his firm handled between 2012 and 2015 (the time he was supposedly working on Gladys's case), nor did he have any billing records.[168] Gladys challenged this by filing declarations from two former employees, Jeb Bond and Mike Sandoval.[169]

Whipple appeared at the order to show cause hearing, where Gladys challenged his response. The court had Whipple take the stand and allowed Gladys to question him.

Whipple's testimony supported Bond and Sandoval's declarations about how Whipple ran his firm, and specifically how they worked on

---

[166] 2-ER-247–253.

[167] 2-ER-246. Gladys served Whipple with the lower court's orders found at 1-ER-59–81, 1-ER-54–58, 2-ER-247–253.

[168] 2-ER-219–220.

[169] 2-ER-212–217.

41

Gladys's case. Whipple testified about the high turnover in his office, how he stores files, and the advice he gives to clients on post-conviction. What was apparent from Whipple's testimony was that Whipple was handling too many cases in too many counties. As a result, he cannot give post-conviction cases, especially large, high-profile cases like this one, which involved a 22-day trial, the time and attention they require. Here, it resulted in abandonment, which is an extraordinary circumstance warranting tolling.

### a. Whipple could locate none of the information the court ordered he provide.

Whipple testified that he used cloud computing to store files in the past, but his office manager conducted a search at his direction and the only thing she could find was "a state report or the state petition."[170] But Whipple didn't store notes and research on the cloud.[171] Notes "would just be contemporaneous and not be kept."[172] Letters may or may not be kept. "So I couldn't speak to letters, but certainly notes are

---

[170] 1-ER-24.

[171] 1-ER-24.

[172] 1-ER-24.

42

not something that I would keep around."[173] Whipple testified that he

would keep copies of letters he sent in the client's file, but wouldn't

admit that if his file contained no letters it meant he didn't send any.[174]

The lower court specifically inquired on this point. Whipple agreed

with the court that when he sent a letter out, he would put a copy in the

file.[175] But he wouldn't admit, under the court's questioning, that notes

would also be kept in the file.[176] Whipple testified that if he took a note

regarding something that needed follow up, he would throw the note

away once he followed up.[177] Whipple agreed that notes and letters of

significance would be in the file;[178] however, the file Whipple turned

over contained no letters and no notes.[179] In fact, the only items in the

file that related to Whipple's work was a copy of the post-conviction

---

[173] 1-ER-24.

[174] 1-ER-25.

[175] 1-ER-25.

[176] 1-ER25–26.

[177] 1-ER-26 ("If the note would be follow up on this, once I follow up on it, I would just throw it away.").

[178] 1-ER-26.

[179] 2-ER-291 at ¶ 15.

43

petition.[180] Investigator Maribel Yanez, who went through all of the boxes Whipple turned over concluded the boxes contained trial counsel's file, which was turned over to Whipple. Other than the post-conviction petition, Yanez couldn't find a single document generated by Whipple's firm.[181]

The lower court asked Whipple about his process for purging files. He said he tries to keep "things 7 years before I destroy them."[182] But he doesn't keep internal accounting, and doesn't have any timekeeping records.[183] The court pointed out that Gladys's case was six years ago, and within that seven-year window, so nothing should have been purged or destroyed.[184] The court summarized Whipple's testimony: "So if it's not in the file, it either didn't exist—it hasn't been destroyed; it

---

[180] 2-ER-291 at ¶ 15.

[181] *Id.*

[182] 1-ER-27.

[183] 1-ER-27.

[184] 1-ER-28.

44

either didn't exist or it's somewhere in an office or who knows where."[185]

Whipple testified that he stores closed files in "two truckloads, you know those 18-wheeler trucks..."[186] He admitted that his "long-term storage is not the way I would like to have."[187] Over the years, he's boxed files and taken it to the trailers and "park[ed] it away."[188]

Whipple provided the FPD seven boxes of Gladys's file two years before, and as a result of the court's order, it provided the remaining eight boxes.[189] About this, Whipple said "that's news to me….I just thought I provided them all to you. I don't know more than that."[190]

As Sandoval's declaration revealed, Whipple first hired him as a

---

[185] 1-ER-28. Whipple responded that the only thing he could think of is a short-term file somewhere in another box that he hasn't been able to find. *Id.*

[186] 1-ER-28. *See also* 1-ER-35 ("I've got two trailers full of information.").

[187] 1-ER-35.

[188] 1-ER-35. "You know, things are just boxed away and taken up there over the different years." 1-ER-36.

[189] 1-ER-72, *citing* 10-ER-2095–2097, 10-ER-2076–2079. *See also* 2-ER-291 at ¶ 14.

[190] 1-ER-29.

45

law student.[191] Although Sandoval could not recall what, if any work he did on Gladys's case,[192] Whipple testified that it was he and Sandoval who worked on the case.[193] According to Whipple, Sandoval "drafted the majority of" the state post-conviction petition.[194] Whipple's role was to "[r]eview and supervise."[195] He agreed he would sign off on pleadings his clerks drafted and file them under his name.[196] This is also borne out by Bond's declaration. He confirmed that Whipple "rarely drafted pleadings from scratch. He would review and approve the work the law clerks did on the case. Nothing got filed unless [Whipple] or another attorney reviewed and approved it—[Whipple] was the one who signed the pleadings."[197]

---

[191] 1-ER-30. *See also* 2-ER-216 (Sandoval's declaration). This is evidently how Whipple hired most people who worked for him. Whipple testified that in addition to Sandoval, Bond and Doug Nutton also both started working for Whipple during law school and stayed on after passing the bar. 1-ER-33. *See also* 2-ER-212 at ¶¶ 2–6.

[192] 2-ER-217 at ¶ 13.

[193] 1-ER-30.

[194] 1-ER-30.

[195] 1-ER-31.

[196] 1-ER-31.

[197] 2-ER-214 at ¶ 23.

46

Whipple could not produce any billing records for the work anyone at his firm did on Gladys's case.[198] The court asked if Whipple could locate the bill, but Whipple said he doesn't "have access to QuickBooks for back in that time period."[199] He testified that he has "never been in a scenario where I have not billed to a client before, and, so, theoretically that exists in this case."[200] If it does, Whipple is the only one who would have it. The Comptroller reported that it never received a bill from Whipple.[201] It had not, as Whipple thought, "been so long that Clark County probably doesn't have a record."[202]

### b. Whipple's firm had high turnover and an extraordinarily high caseload.

Whipple's testimony, generally,[203] in addition to Bond and

---

[198] 1-ER-34.

[199] 1-ER-35–36.

[200] 1-ER-34.

[201] 2-ER-293.

[202] 1-ER-35. The Comptroller doesn't throw away records. According to its website, it "maintains all historical financial data for the County." *See* https://bit.ly/37OvSjw.

[203] *See* 1-ER-36–38.

Sandoval's declarations,[204] reveals high turnover at Whipple's firm, which was apparent in this case from the fact that Whipple was one of three lawyers who appeared in court on Gladys's behalf.[205] Sandoval appeared at the hearing on the petition, not Whipple.[206] Whipple testified that he often has "a number of appearances" in multiple places at once, so he and his team would decide who would cover what hearing the night before.[207] "And, so, you know, I would have – it's not unusual to have a whole – you know, I would have a number of appearances in Las Vegas, I would have appearances in Henderson, I have appearances, you know, North Las Vegas, so, as a team, we would break those up the day before, right? So if it was significant, then obviously I would be there."[208] The logical conclusion is that if it wasn't important, Whipple didn't attend. By extension, since Whipple sent

---

[204] 2-ER-212–215 (Bond's declaration); 2-ER-216–217 (Sandoval's declaration).

[205] 3-ER-529–530 (describing the state post-conviction proceedings).

[206] 1-ER-31.

[207] 1-ER-34.

[208] 1-ER-34.

Sandoval to argue Gladys's one and only state post-conviction petition, he must have concluded it was not "significant."

There's no doubt that Whipple has a number of appearances every day that he has to juggle. In fact, in the middle of Whipple's testimony in federal court, he revealed he was expected in state court on a probate matter.[209] And there's no way to come up with the exact number of cases Whipple's firm handled at the time he represented Gladys. Whipple testified that he does not keep records of how many cases his firm handled for a specific time period.[210] Whipple agreed that a search of his name by county would reveal the number of cases he was personally on, but not the number his firm was handling.[211] "I'm the owner of the – of my business, but I would have multiple attorneys retained and working for me as well. Just like Mr. Nutton worked for a time, Miss Engler worked for an extended period of time, Chad [sic] Bond worked for a period of time, Mr. Sandoval, all these different people working for me,

---

[209] 1-ER-29. *See also* 1-ER-43 (the court offered to call the court on Whipple's behalf to let them know he was running late).

[210] 1-ER-37.

[211] 1-ER-37.

other attorneys at different times."[212] Whipple said he didn't know if he could come up with dates of employment for the people who worked for him at the time he represented Gladys.[213]

Whipple's testimony means that the 592 cases is an *underestimate* because these are the number of cases Whipple was involved in and don't reveal cases other attorneys were handling at the same time because Whipple didn't keep records to show who worked for him when.[214]

By any measure, Whipple's caseload was unmanageable and amounts to an extraordinary circumstance.[215] He couldn't possibly have given Gladys's case the attention it deserved in light of his high caseload and the way he ran his business. That's true even accepting his explanation on cross-examination that "[a] lot of the work I do

---

[212] 1-ER-37.

[213] 1-ER-38.

[214] Only one county, White Pine, provided a case list based on Whipple's firm. 2-ER-267–269. The remainder of Whipple's case list that Gladys provided was based on Whipple alone, not his firm. *See* 2-ER-297–326, 2-ER-187–195.

[215] *See also* 3-ER-530–534 (Opposition discussing Whipple's abandonment).

doesn't take a lot of time. You're just there to show up to see if the client did the things that they're supposed to do...I mean, it's very simple."[216] This claim is undercut by Whipple's case lists, which reveal a number of criminal cases, including death penalty cases.[217] Presumably, not all of them, or even the majority of them, relate to showing up and seeing if the client did what he or she needed to do. Such a claim also contradicts Whipple's testimony that he attends the most significant hearings, leaving the easier stuff to the attorneys who work with him.[218]

But even if all of that is true, Gladys's case wasn't simple—Whipple needed only to read the briefs from her direct appeal to realize that. This was a 22-day trial with a co-defendant facing death. And this was Gladys's one and only chance to present claims outside of the record—claims an investigator might help uncover if one had been hired. Instead, Whipple—or rather, Sandoval—did no investigation and

---

[216] 1-ER-41.

[217] *See* 2-ER-297-326, 2-ER-267–269, 2-ER-187–195.

[218] 1-ER-34.

limited his claims to those obvious by the record.[219]

### 7.   Whipple's abandonment and the prison's interference warrant equitable tolling.

Gladys's repeated desire to pursue her case to the end should have been enough to trigger Whipple to file the notice of appeal. At a minimum, Whipple had a duty to consult Gladys after the court issued its decision—something that was particularly challenging for Whipple, given the nature of his practice.

First, Gladys told Whipple she wanted to appeal before the court decided her state post-conviction petition.[220]

Second, there is no evidence Whipple contacted Gladys after the hearing to discuss her options, as he was ethically required to do.[221] More than that, even if Whipple had contacted here, there is no reason to believe he would have given her sound legal advice.

Whipple testified that "in a particular case like this we'd say, well, you have to take it up on a federal appeal and there are other attorneys

_____

[219] *See* 1-ER-32. *See also* 7-ER-1499–1516 (state post-conviction petition); 3-ER-528–530 (describing post-conviction proceedings).

[220] 5-ER-1018.

[221] 2-ER-291 at ¶ 15.

that do that. And I would also advise them, I believe, and this is –
maybe I'm extending myself, but there are – there are – they should ask
at the prison, there's different packets that they have that they can tell
them what the next step would be and if they needed any additional
information to contact me or if they wanted to call another private
attorney to call me."[222]

Such advice skips the critical step of appealing the denial of a
state post-conviction petition to the Nevada Supreme Court. Whipple
was asked about that very thing:

> Q. This was a state post-conviction final order.
> Would you advise the client of their right to appeal
> and how many days they had to appeal that
> decision in state court?
>
> A. So — so the answer is I don't know. I'm sorry. I
> just — I tell them — the answer is, honestly, I
> don't know. I just tell them what has happened
> and that — you know, that, unfortunately, we're
> now at a juncture they're going to have to take
> another route or another step. And I can't — I can't
> recall – I don't have a set pattern. I don't recall
> specifically telling another individual, you know,
> that particular issue. I'm sorry.[223]

---

[222] 1-ER-39.

[223] 1-ER-39–40.

It's incredibly alarming that Whipple doesn't routinely advise

clients to appeal adverse state post-conviction decisions, even if he can't

remember specifically what he did in this case. Such advice, if routinely

given, demonstrates Whipple's true lack of understanding of Nevada's

state post-conviction process, to say nothing of federal habeas, or as

Whipple called it, "a federal appeal."[224]

Third, Whipple didn't have a reliable system for calendaring

important jurisdictional deadlines, like a notice of appeal. According to

Bond, when a court order came in through the mail, the office manager

would normally calculate the next deadline.[225] But she wouldn't know

how to calculate the deadline for a final order that required a notice of

appeal. "She'd give the order to the law clerk and then the law clerk

would give it to Bret. Bret would calculate the deadline and tell the law

clerk and the law clerk would calendar it."[226] But it's not clear who

would take responsibility for actually drafting and timely filing the

notice of appeal, even it was correctly calendared after passing through

---

[224] 1-ER-39.

[225] 2-ER-214 at ¶ 27.

[226] 2-ER-214 at ¶ 27.

54

so many hands.

Fourth, there is no evidence Gladys received a copy of the written order denying her petition from either Whipple or the state district court and knew her deadline for filing a notice of appeal was running. The notice of entry, findings of fact, conclusions of law and order were filed by the state district court on January 21, 2014.[227] But the prison's January mail logs do not show that Gladys received any mail from either the court or Whipple immediately following that day.[228] Indeed, the first mail Gladys receives from the state court is received nine months later on October 6, 2014.[229]

Whether it was because he was too busy or for some other reason, the bottom line is that Whipple abandoned Gladys. He failed to inform Gladys of her options, to provide her with a copy of the court's written order, and to perfect the appeal as she instructed him early in the case. Accordingly, Gladys is entitled to equitable tolling, and reasonable jurists could disagree with the lower court's contrary conclusion.

---

[227] 5-ER-1123–1137.

[228] 6-ER-1322–1323.

[229] 6-ER-1324.

Although Whipple's abandonment alone warrants tolling, that abandonment coupled with the prison's interference, which had a direct impact on her ability to timely file her petition, guarantees it. Even ignoring all of the many problems the law library had, the business office's failure to timely process Gladys's request for payment of the filing fee is enough to warrant tolling. The failure to provide the financial certificate, as she requested, was directly responsible for her petition being filed late. *See also* Section I(E), *infra* (describing why the certificate was necessary for filing). Had the prison processed the request when Gladys asked, her petition would have been filed on time. That alone is enough to warrant tolling.

### E. Gladys is entitled to statutory tolling

The same facts that warrant equitable tolling for the prison's interference warrant statutory tolling. *See* Section I(D)(4).

As explained above, the Florence McClure law library during 2013–2014 was hardly open, preventing Gladys from timely filing her petition. On top of that, prison officials directly interfered when it failed to process Gladys's request for a financial certificate in a reasonable time.

Prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977). The right of access is grounded in the Due Process and Equal Protection Clauses. *Murray v. Giarratano*, 492 U.S. 1, 6, (1989). To ensure meaningful access, states have the affirmative obligation to provide inmates with "adequate law libraries or adequate assistance from persons trained in the law." *Bounds*, 430 U.S. at 828. But, prisoners don't enjoy a free-standing constitutional right to law library access. *Lewis v. Casey*, 518 U.S. 343 (1996). *See also Johnson v. Moore*, 948 F.2d 517, 521 (9th Cir. 1991) ("the Constitution does not guarantee a prisoner unlimited access to a law library. Prison officials must regulate the time, manner, and place in which library facilities are used.").

Law libraries are only the means for ensuring "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Bounds*, 430 U.S. at 825. In order to show that the claimed impediment was unlawfully imposed upon her, petitioner must show that the inadequate access to the law library caused her an actual injury. *Lewis*, 518 U.S. at 351-52. In other words, she must demonstrate that the lack of access to the library actually

57

prevented her from filing her federal habeas petition. Gladys can meet this test. She was unable to timely file her petition because she didn't have access to legal resources. And when she did, those resources were inadequate. Even looking beyond the library's completely unpredictable hours, the prison didn't have current forms or instructions for filing a § 2254 petition. On top of that, the prison delayed providing Gladys with her financial certificate by several weeks, directly impacting Gladys's ability to file her petition.

All the inmate can do is follow the required procedure for mailing, as Gladys did here. *See Miles v. Prunty*, 187 F.3d 1104 (9th Cir. 1999). Like *Miles*, Gladys was "an incarcerated pro se litigant…depend[ant] on prison authorities[.]" *Miles*, 187 F.3d at 1107. "Once Miles made his request, any delay on the part of prison officials in complying with Miles' instructions was not within Miles' control." *Id*. The same was true for Gladys. The prison's delay in processing her financial certificate and its refusal to have regular or reasonable law library hours, while also enforcing a rule that inmates can only mail legal documents through the law library, directly prevented Gladys from timely filing her petition.

58

Had Gladys filed her petition without the financial certificate, it would have been dismissed. *See Ocegueda v. Gentry*, 2:15-cv-01884-JCM-GWF, ECF No. 4 (dismissing a habeas case for filing to pay the $5 filing fee or file a motion to proceed *in forma pauperis*);[230] D. Nev. Local Rule LSR 1-2 (requiring a financial certificate to file a motion to proceed *in forma pauperis*). *See also Sanders v. Williams*, 2015 WL 5256857 (D. Nev. 2015) (refusing to reconsider the dismissal of a § 2254 petition because the petitioner "failed to include a copy of his inmate account statement or a financial certificate signed by an authorized prison or jail officer as 28 U.S.C. § 1915(a)(2) and Local Rule LSR 1-2 require.").

Nevada's federal district court has a long history of dismissing petitions that are accompanied by a motion to proceed *in forma pauperis* without a financial certificate, as evidenced by *Fixel v. U.S. Dist. Court of Nevada*, 1991 WL 42168 (9th Cir. 1991), a case from the late 1980s that resulted in the dismissal of two habeas cases for failure

---

[230] The lower court granted a Rule 60(b) motion in this matter because the court never ruled on the petitioner's quickly filed motion to reconsider the dismissal for the lack of a proper IFP application. *Ocegueda* ECF No. 16.

"to include the appropriate financial certificate as required by the Federal Local Court Rules, Nevada (local court rules) governing motions for leave to proceed *in forma pauperis*." *Id.* at *1.

Gladys couldn't file her petition without her financial certificate. Here, she had to ask for it twice, which caused a delay of at least two weeks. By the time she got it, it was December 1, 2014, and she still had to obtain a law library appointment, without which she couldn't mail her petition. Accordingly, Gladys is entitled to statutory tolling. The state's impediment didn't lift until Gladys was able to mail her petition.

## CONCLUSION

Gladys is entitled to equitable and statutory tolling.[231] Her state post-conviction attorney, Bret Whipple's abandonment and interference by prison officials prevented Gladys from timely filing her petition.[232] Not only could Gladys sporadically access the law library, but the business office failed to timely process her request for her financial certificate—a necessary document for filing a *pro se* § 2254 petition. Gladys diligently pursued her rights throughout her case. Thus, she

---

[231] 3-ER-527–544; 2-ER-163–184.

[232] 3-ER-527–544; 2-ER-163–184.

60

meets the test for equitable tolling. The prison interference on its own also qualifies for statutory tolling. Either way—through equitable tolling or statutory tolling—Gladys's petition should be considered on the merits, and this Court should reverse. Should this Court conclude that more evidence is necessary in support of Gladys's claims to tolling, this Court should remand for an evidentiary hearing.

Dated January 17, 2023.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/ Amelia L. Bizzaro*
Amelia L. Bizzaro
Assistant Federal Public Defender

# FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Number(s)** 22-15279

I am the attorney or self-represented party.

**This brief contains 10,527 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ *Amelia L. Bizzaro*      **Date** 1/17/2023
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/18*